(February 26, 2009)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOMINICK J. DEDEO, Appellant. [874 NYS2d 291]—

Stein, J. Appeal from a judgment of the County Court of Columbia County (Czajka, J.), rendered August 7, 2006, upon a verdict convicting defendant of the crimes of grand larceny in the second degree (five counts), grand larceny in the third degree (two counts) and scheme to defraud in the first degree.

Defendant, a financial advisor, formed an estate planning business with his son and solicited customers through targeted mailings. Among other things, defendant's clients entrusted him with funds for investment in exchange for a guaranteed rate of return. Upon defendant's failure to make certain periodic payments to clients as promised, the Attorney General commenced an investigation, which resulted in an indictment charging defendant with five counts of grand larceny in the second degree, two counts of grand larceny in the third degree and one count of scheme to defraud in the first degree. After trial, defendant was convicted on all eight counts. County Court

sentenced him to an aggregate prison term of 19 $\frac{2}{3}$ to 59 years[1] and ordered him to pay restitution in the amount of approximately $1.9 million. Defendant now appeals.

Initially, we find no merit to defendant's contention that County Court erred in granting the People's motion to amend the bill of particulars to clarify that the victims named in counts one through seven of the indictment (the counts charging defendant with grand larceny) were not the only victims of count eight (relating to the charge of scheme to defraud).[2] The fact that the amendment added more victims to the alleged scheme to defraud and expanded the duration of the scheme did not change the theory of the case and, thus, did not result in a constructive amendment to the indictment (*see People v West*, 271 AD2d 806, 807-808 [2000], *lv denied* 95 NY2d 893 [2000]; *compare People v Grega*, 72 NY2d 489, 499-500 [1988]; *see also* CPL 200.70 [1]; *People v Brown*, 196 AD2d 428, 430 [1993], *lv denied* 82 NY2d 804 [1993]).

Furthermore, a bill of particulars may generally be amended at any time, provided that "no undue prejudice will accrue to defendant and that the prosecutor has acted in good faith" (CPL 200.95 [8]; *People v Wright*, 13 AD3d 803, 804 [2004], *lv denied* 4 NY3d 857 [2005]). Any claim of prejudice to defendant here is belied by the fact that, when faced with the proposition that County Court would allow the People to present the additional witnesses, defendant declined an offer of additional time to prepare for trial. Nor is there any evidence of bad faith on the part of the prosecutor. In fact, the identities of the witnesses/victims were disclosed to defendant in the early stages of the prosecution.

We also disagree with defendant's assertion that County Court's denial of his challenge for cause to prospective juror No. 105 was reversible error. Initially, this juror indicated to defense counsel that he thought defendant would not have been indicted unless he was guilty. The court then asked the juror whether he could set aside that feeling "and follow the law exactly as I give it to you, including that most basic principle of law . . . that [d]efendant is presumed to be innocent?", to which juror No. 105 replied, "Yes." The court further asked him if he could do so "[w]ithout hesitation or reservation?" and the juror responded, "True." When defense counsel continued to press

---

1. Pursuant to Penal Law § 70.30 (1) (e) (i), the sentence will be automatically reduced to 10 to 20 years.

2. This amendment allowed the People to use additional witnesses as direct proof on count eight and as indirect proof of intent on counts one through seven.

the issue of the presumption of innocence, the juror indicated that he believed the defense team had a "responsibility . . . to prove [defendant's innocence] to us beyond a doubt." This exchange caused the court to intervene again and explain that "[o]nly the People . . . have the burden of proof. The [d]efendant does not have to prove his innocence. He doesn't have to prove anything." After this explanation, juror No. 105 indicated that he understood and was able to follow the law "in principle." Being dissatisfied with this response, the court told the juror that, "when you qualify it in principle, it requires me to press you further." The following colloquy between the court and the juror then ensued:

"JUROR 105: Well, I bring into here, into this courtroom, the fact that I'm an emotional human being, so I have to work with myself and my intellect, to allow my intellect to be open-minded and objective, so this is a constant struggle I have . . . That's why I say in principle, because I will always have those struggles.

"THE COURT: Do you have any reason to believe that your struggle will be unsuccessful?

"JUROR 105: No."

Upon further probing by defense counsel as to whether this juror believed that he was required to prove his client's innocence, juror No. 105 responded, "No. This is my first experience [as a juror], so you know, I'm learning as I go along."

Based on the foregoing, we find that County Court elicited a sufficiently "unequivocal assurance" that juror No. 105 could uphold the presumption of innocence and judge the facts in a fair and impartial manner (*People v Arnold*, 96 NY2d 358, 362-363 [2001]; *see People v Williams*, 63 NY2d 882, 884-885 [1984]; *People v Porlier*, 55 AD3d 1059, 1061 [2008]). Therefore, we discern no abuse of discretion in County Court's denial of defendant's challenge for cause.

We turn next to defendant's contention that the verdict was against the weight of the evidence, particularly with respect to the element of intent. As relevant here, in order to convict defendant of the larceny charges, the People were required to prove that he wrongfully took, obtained[3] or withheld his clients' money with the intent to deprive them of such funds or to ap-

---

**3.** "A person obtains property by false promise when, pursuant to a scheme to defraud, he [or she] obtains property of another by means of a representation, express or implied, that he [or she] . . . will in the future engage in particular conduct, and when he [or she] does not intend to engage in such conduct" (Penal Law § 155.05 [2] [d]).

propriate them to himself (*see* Penal Law § 155.05 [1]). With regard to the charge of scheme to defraud, it was necessary for the prosecution to establish "a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises" (Penal Law § 190.65 [1] [b]).

In support of their theory that defendant had orchestrated a "Ponzi scheme" to defraud older clients out of money, the People presented the testimony of defendant's son and numerous former clients of defendant as to their financial dealings with him. Defendant's son testified, among other things, that he and defendant solicited customers from mailing lists of people over the age of 45 or 50. He also testified that defendant had established a bank account in the son's name in order to avoid certain tax problems and repeatedly signed the son's name to checks drawn on such account. Five clients testified that, after being solicited by defendant, they liquidated assets, invested the proceeds with defendant in exchange for his promise of a certain rate of return and never recouped what they were promised. They also testified that defendant failed to return the principal invested by them despite their requests that he do so.

Nearly a dozen witnesses testified that they were asked by defendant to invest funds, either directly with him or in his real estate holdings business, in exchange for rental income and/or a favorable rate of return that never materialized and resulted in the loss of substantial sums of money. By way of example, one 84-year-old victim—who originally responded to defendant's mail solicitation and hired him to draft a trust for her—failed to receive interest payments promised on money invested to fund the trust and eventually lost her home due to defendant's failure to repay money that she had loaned to him. Another witness testified that he and his wife initially hired defendant to draft a trust and later signed over to him the proceeds of certain assets based upon his promise of a higher rate of return. They also gave defendant money for the specific purpose of purchasing shares of a particular stock. Defendant never purchased that stock, paid no interest on the investments and refunded only a small fraction of the principal.

There was further testimony that defendant failed to return phone calls and changed his address without notifying his clients of his whereabouts. The evidence also demonstrated that defendant repeatedly failed to respond to requests for return of investment principal and would provide empty assurances in order to stave off investors and/or secure more "investments"

from them. One witness testified that, when he and his wife finally confronted defendant and asked what he had done with their money, defendant replied, "I spent it" and also said, "You know what, I'm no good bastard [*sic*]."

Defendant did not testify or call any witnesses at trial. In arguing the absence of larcenous intent, he points to evidence that certain clients received lump-sum payments, to evidence of clients whose initial investments were successful, to the "modest" rates of return promised (8% to 15%), and to the lack of any evidence that defendant attempted to evade the authorities. He claims that the evidence as a whole indicates merely that his financial endeavors failed as a result of poor business practices.

In exercising our authority to review the weight of the evidence, we must "review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (*People v Danielson*, 9 NY3d 342, 348 [2007]; *see People v Romero*, 7 NY3d 633, 636 [2006]; *People v Bleakley*, 69 NY2d 490, 495 [1987]; *People v Khuong Dinh Pham*, 31 AD3d 962, 964 [2006]). Viewing the evidence in a neutral light and giving "appropriate deference to the jury's superior opportunity to assess the witnesses' credibility" (*People v Gilliam*, 36 AD3d 1151, 1152-1153 [2007], *lv denied* 8 NY3d 946 [2007]; *see People v Griffin*, 26 AD3d 594 [2006], *lv denied* 7 NY3d 756 [2006]), even if a different finding would not have been unreasonable, we conclude that the verdict was not contrary to the weight of the credible evidence (*see People v Bleakley*, 69 NY2d at 495). Inasmuch as "[f]raudulent intent is usually not susceptible of proof by direct evidence and must ordinarily be inferred from circumstantial evidence" (*People v Sala*, 258 AD2d 182, 188-189 [1999], *affd* 95 NY2d 254 [2000]), in our view, there is ample support in the record for the jury's conclusion that defendant never intended to make good on his promises to clients. The People's theory that defendant solicited older clients, learned of their financial status by drafting trusts, and then convinced them to invest their assets with no intent to fulfill his promises to them regarding their investments—and, instead, with the intent of benefitting himself—is substantiated by the testimony of his son regarding defendant's business practices and by the abundant testimony of his former clients evidencing his continuous course of conduct for over a decade. That defendant never intended to repay their money can be inferred from, among other things, his pattern of targeting older clients, his record of failing to repay large sums of money in full or not at all, his repeated failure to follow through on specific requests from his clients that he return their initial investment, his repeated

excuses for such failure, and his attempts to evade their efforts to contact him.

Under the circumstances of this case, we also reject defendant's argument that the sentence was harsh and excessive. In view of the predatory nature and duration of defendant's crimes, the number of victims and the severe impact that defendant's conduct had upon his victims and their families, among other things, we are not persuaded that the factors argued by defendant in mitigation are so extraordinary as to warrant a reduction in his sentence (*see People v Provost*, 25 AD3d 1016, 1017 [2006], *lv denied* 6 NY3d 817 [2006]; *People v Lanfair*, 18 AD3d 1032, 1034 [2005], *lv denied* 5 NY3d 790 [2005]).

We further find defendant's pro se arguments to be without merit. His claims regarding lack of geographic jurisdiction are negated by the evidence that the bank account in which defendant deposited money taken from the victims was in Columbia County and that he met some of the victims in their homes within that county (*see* CPL 20.40 [1] [a]; *People v Bigness*, 28 AD3d 949, 950 [2006], *lv denied* 7 NY3d 810 [2006]). With regard to the order directing the payment of restitution, defendant waived his right to have a hearing to challenge the amount thereof. Furthermore, although he did not waive his objection to the order insofar as it directed the payment of restitution to those not named in the indictment and/or who did not testify, such objection is also without legal basis (*see* Penal Law § 60.27; *People v Hall-Wilson*, 69 NY2d 154, 157-158 [1987]; *People v Prewett*, 126 AD2d 86, 89-90 [1987], *lv dismissed* 70 NY2d 693 [1987]). We have considered defendant's remaining contentions and similarly find them to be unavailing.

Peters, J.P., Lahtinen and Kavanagh, JJ., concur. Ordered that the judgment is affirmed.