*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:   July 21, 2016                    104210
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                    Respondent,

        v                                    MEMORANDUM AND ORDER

SCOTT THORPE,
                    Appellant.
_____

Calendar Date:   May 24, 2016

Before:   Lahtinen, J.P., McCarthy, Garry, Clark and Mulvey, JJ.

_____

        Michelle E. Stone, Vestal, for appellant.

        J. Anthony Jordan, District Attorney, Fort Edward (Hannah
E.C. Moore, New York Prosecutors Training Institute, Inc.,
Albany, of counsel), for respondent.

_____

Clark, J.

        Appeal from a judgment of the County Court of Washington
County (Hall Jr., J.), rendered March 18, 2011, upon a verdict
convicting defendant of the crimes of kidnapping in the second
degree, attempted murder in the second degree, assault in the
second degree, assault in the third degree, conspiracy in the
second degree, criminal possession of a weapon in the second
degree, criminal use of a firearm in the first degree, gang
assault in the second degree, menacing in the second degree,
coercion in the first degree, criminal sale of a controlled
substance in the third degree, criminal possession of a
controlled substance in the fifth degree, criminal sale of a
controlled substance in the fifth degree, criminal possession of
marihuana in the third degree and robbery in the first degree.

In April 2010, William Dingman lured the victim to a partially-constructed house under the pretense of performing roofing work for the owner. After descending from the roof, the victim was confronted by defendant, Richard Cates and Dingman and, following a brief struggle, was forced into the basement of the house. The victim's hands were tied around a pole and he was told to choose how he would like to die: either by chainsaw or by overdose. The victim, who was a recovering cocaine addict, chose overdose and was thereafter forced by defendant and his accomplices to ingest heroin and ecstasy and was injected with various substances, including heroin and air. When defendant and his accomplices ran out of drugs and the hypodermic needle broke, they decided that they would drive the victim to a different location, where they would force the victim – at gunpoint – to slit his wrist. The victim ultimately escaped from the car and sought medical attention.

Defendant was charged in a 19-count indictment and, following a jury trial, convicted of 15 counts: kidnapping in the second degree, attempted murder in the second degree, assault in the second degree, assault in the third degree, conspiracy in the second degree, criminal possession of a weapon in the second degree, criminal use of a firearm in the first degree, gang assault in the second degree, menacing in the second degree, coercion in the first degree, criminal sale of a controlled substance in the third degree, criminal possession of a controlled substance in the fifth degree, criminal sale of a controlled substance in the fifth degree, criminal possession of marihuana in the third degree and robbery in the first degree. County Court sentenced him, as a second felony offender, to an aggregate prison term of 75 years to be followed by five years of postrelease supervision.[1] Defendant now appeals.

Defendant argues that his convictions for attempted murder

---

[1] Although County Court attempted to impose consecutive periods of postrelease supervision, the periods merged by operation of law (see Penal Law § 70.45 [5] [c]; People v Passino, 104 AD3d 1060, 1061 [2013], lv denied 22 NY3d 1157 [2014]).

in the second degree and gang assault in the second degree are not supported by legally sufficient evidence and are against the weight of the evidence. Inasmuch as defendant made only a general motion to dismiss at the close of the People's proof, his challenge to the legal sufficiency of the evidence is unpreserved (see People v Powell, 128 AD3d 1174, 1175 [2015]; People v Junior, 119 AD3d 1228, 1229 [2014], lv denied 24 NY3d 1044 [2014]). Nevertheless, in conducting our weight of the evidence review, we necessarily consider whether all of the elements of the charged crimes were proven beyond a reasonable doubt (see People v Briggs, 129 AD3d 1201, 1202 [2015], lv denied 26 NY3d 1038 [2015]; People v Santiago, 118 AD3d 1163, 1164 [2014], lv denied 24 NY3d 964 [2014]). In a weight of the evidence review, where a different finding would not have been unreasonable, we "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citations omitted]; accord People v Carnevale, 101 AD3d 1375, 1377 [2012]).

For a conviction of attempted murder in the second degree, "the People were required to prove that defendant, acting with intent to cause the death of another, engaged in conduct which tended to effect the commission of that crime" (People v Greenfield, 112 AD3d 1226, 1226 [2013], lv denied 23 NY3d 1037 [2014]; see Penal Law §§ 110.00, 125.25 [1]). To obtain a conviction for gang assault in the second degree, the People had to prove that, "with intent to cause physical injury to another person and when aided by two or more other persons actually present, [defendant] cause[d] serious physical injury to such person" (Penal Law § 120.06). The term "'[p]hysical injury' means impairment of physical condition or substantial pain" (Penal Law § 10.00 [9]) and the term "[s]erious physical injury" means, as relevant here, "physical injury which creates a substantial risk of death" (Penal Law § 10.00 [10]).

At trial, the victim testified that defendant, Cates and Dingman tied his hands around a pole in the basement of the house and told him that they were going to kill him for stealing 11 pounds of marihuana from defendant 14 years earlier. The victim stated that defendant told him that it was "going to go one way

or the other," namely, that he could be cut up, buried and his body never found or his family could believe that he died of an overdose. According to the victim, defendant was "in control the whole time" and told the others what to do. The victim asserted that, after choosing an overdose, defendant and his accomplices "pull[ed his] head back" to make him sniff heroin, dumped beer down his face, caused heroin and cocaine to be injected into veins in his inner arms between four and eight times and forced him to swallow a "handful of ecstasy a couple of times." According to the victim, defendant stated, "you're going out like a big drug dealer" and, at some point, asked, "how much cocaine is it going to take to kill you?" The victim vomited several times. He further testified that defendant and his accomplices had a knife and a gun, showed him pictures of mutilated people, including children, who defendant claimed to have killed and took pictures and videos of the incident. The victim testified that defendant and his accomplices also injected him with air in an effort to stop his heart and that they were all screaming "die" as they did so. The victim asserted that the needle broke and that, because he was fearful that defendant and his accomplices would then resort to using the chainsaw to kill him, he suggested that they force him to slit his wrist. Defendant accepted this plan, dictated a suicide note to the victim and, at gun point, forced the victim into the car from which he ultimately escaped. The victim testified that the trauma of the ordeal caused him to lapse into a period of heavy drinking and marihuana use and resulted in him losing his job and his admission to a mental health unit.

The victim's account of the harrowing incident was largely corroborated through the testimony of Dingman, investigators in the Washington County Sheriff's Office and the emergency room physician that treated the victim, as well as the forensic evidence and the numerous pictures and videos admitted into evidence, which depicted the victim in a distressed state during the terrifying ordeal. According to Dingman, defendant had developed the plan to lure the victim to the house, had often expressed a desire to kill the victim and threatened to harm the victim's children if the victim did not cooperate. Dingman stated that the victim was forced to sniff "[p]owder," swallow pills and inject himself with heroin while at gunpoint. Dingman

further testified that, when the overdose plan was unsuccessful, defendant was going to force the victim to slit his wrist. The investigators found a syringe in both the basement and the vehicle from which the victim escaped and, with Dingman's assistance, located a bag — containing pills, a rope and gloves — hidden by defendant on the side of the road. DNA consistent with the victim was found on both syringes.

The emergency room physician testified that the victim had four puncture marks on his right inner arm and tested positive for opiates and cocaine. He stated that the victim reported nausea, vomiting and a pain level of 6 out of 10, had an elevated pulse, respiratory rate and blood pressure and had a high glucose level and white blood count. He testified that an overdose of heroin and cocaine can result in death, as cocaine causes increased blood pressure and other blood pressure-related problems and heroin prevents a portion of the brain from functioning. The physician further asserted that injections of air into the body can cause "a lot of very harmful things," such as stroke and death.

While a different result would not have been unreasonable, viewing the foregoing evidence in a neutral light and according deference to "the jury's unique opportunity to view the witnesses, hear the testimony and observe demeanor" (People v Lanier, 130 AD3d 1310, 1311 [2015] [internal quotation marks and citations omitted], lv denied 26 NY3d 1009 [2015]), we are satisfied that defendant's convictions for attempted murder in the second degree and gang assault in the second degree are supported by the weight of the credible evidence. Defendant's intent to physically injure the victim, with the aid of Cates and Dingman, and to cause his death can be readily inferred from the circumstances, including the repeated and forceful administration of heroin, cocaine and ecstasy to the victim, the injections of air into the victim's bloodstream and the fact that defendant dictated a suicide note to the victim, as well as defendant's statements to the victim (see People v Hamilton, 127 AD3d 1243, 1245 [2015], lvs denied 25 NY3d 1164 [2015]; People v Caldwell, 98 AD3d 1272, 1272-1273 [2012], lv denied 20 NY3d 985 [2012]; People v Zindle, 48 AD3d 971, 973 [2008], lv denied 10 NY3d 846 [2008]). Additionally, as demonstrated by the testimony of the

victim and the physician, the victim sustained physical injuries
when defendant repeatedly caused the foreign substances of
cocaine, heroin and air to enter the victim's bloodstream in a
short period of time, thereby creating serious adverse internal
reactions which alone, or together, put the victim's life
substantially at risk (see People v Daniels, 134 AD3d 525, 525
[2015]; compare People v Tucker, 91 AD3d 1030, 1031-1032 [2012],
lv denied 19 NY3d 1002 [2012]).  Accordingly, we decline to
disturb defendant's convictions of attempted murder in the second
degree and gang assault in the second degree.[2]

Additionally, County Court properly determined that
defendant's conviction for kidnapping in the second degree was
not precluded by the merger doctrine.  "The merger doctrine is
intended to preclude conviction for kidnapping based on acts
which are so much the part of another substantive crime that the
substantive crime could not have been committed without such acts
and that independent criminal responsibility may not fairly be
attributed to them" (People v Cassidy, 40 NY2d 763, 767 [1976];
see People v Mao-Sheng Lin, 50 AD3d 1251, 1252 [2008], lv denied
10 NY3d 961 [2008]).  Here, the restraint of the victim lasted
several hours, was not "simultaneous and inseparable" from
defendant's other crimes and amounted to more than the "minimal
intrusion necessary and integral to [the commission of the other
crimes]" (People v Gonzalez, 80 NY2d 146, 153 [1992]; see People
v Collazo, 45 AD3d 899, 901 [2007], lv denied 9 NY3d 1032 [2008];
People v Rosado, 26 AD3d 532, 533 [2006], lv denied 7 NY3d 762
[2006]).  Moreover, the merger doctrine was not intended to apply

---

[2]  Defendant's contention that his acquittal on the charge
of assault in the second degree is inconsistent with his
convictions for attempted murder in the second degree and gang
assault in the second degree was not preserved for our review
(see People v Satloff, 56 NY2d 745, 746 [1982]; People v Vargas,
72 AD3d 1114, 1119 n 5 [2010], lv denied 15 NY3d 758 [2010];
People v Britton, 27 AD3d 1014, 1015 [2006], lv denied 6 NY3d 892
[2006]), and we decline to take corrective action in the interest
of justice (see People v Jones, 79 AD3d 1244, 1245 n [2010], lv
denied 16 NY3d 832 [2011]; People v Johnson, 40 AD3d 1270, 1273
[2007], lv denied 9 NY3d 877 [2007]).

to "kidnapping abductions designed to . . . accomplish murder" (People v Miles, 23 NY2d 527, 539 [1969], cert denied 395 US 948 [1969]; see People v Kalyon, 142 AD2d 650, 650-651 [1988], lv denied 72 NY2d 1046 [1988]).

Defendant also argues that County Court erred in denying his challenges for cause to juror Nos. 92 and 57. "[A] prospective juror whose statements raise a serious doubt regarding the ability to be impartial must be excused unless the juror states unequivocally on the record that he or she can be fair and impartial" (People v Chambers, 97 NY2d 417, 419 [2002]; see CPL 270.20 [1] [b]; People v Arnold, 96 NY2d 358, 362 [2001]). While prospective jurors are not required to engage in "any particular expurgatory oath" or recite certain "'talismanic' words, [they] must clearly express that any prior experiences or opinions that reveal the potential for bias will not prevent them from reaching an impartial verdict" (People v Arnold, 96 NY2d at 362; see People v Harris, 19 NY3d 679, 685-686 [2012]).

Here, juror No. 92 indicated that she had previously sat on a grand jury and found it "difficult" to view the pictures and hear the evidence, expressed hesitation about her ability to not be influenced by "emotion or shocking photos" and acknowledged reading about defendant in a newspaper.[3] County Court addressed juror No. 92, stating, "I know you're not going to like [seeing pictures of gory injuries], there may be some things in there that you don't care to see, wouldn't care to see again, but can you still do it[?]" Juror No. 92 responded, "I would be fair." Upon further inquiry by the court, juror No. 92 agreed that a particular newspaper was not "always 100 percent accurate" and that the opinions she forms after reading newspaper articles were "not always right." County Court then asked, "would you look at the evidence, pictures, documents, reports, whatever kinds of things the evidence is and make your decision on that, not anything you learned outside of the courtroom or before the case

_____

[3] We note that defendant used a peremptory challenge on juror No. 92 and exhausted his peremptory challenges before the selection of the regular jury was complete (see CPL 270.20 [2]; People v Harris, 19 NY3d at 685).

started?" Juror No. 92 stated, "Yes." In our view, the responses given by juror No. 92 constituted clear and unequivocal assurances that she could be fair and impartial (see People v DeDeo, 59 AD3d 846, 848 [2009], lv denied 12 NY3d 782 [2009]; People v Knowles, 79 AD3d 16, 23 [2010], lv denied 16 NY3d 896 [2011]). Accordingly, County Court did not abuse its discretion in denying defendant's challenge for cause to juror No. 92.

With respect to juror No. 57, at the time that defendant exercised a peremptory challenge on juror No. 57, the regular jury and the first alternate juror had already been selected and the second alternate was being selected. Defendant had one remaining peremptory challenge left after the second alternate juror seat was filled.[4] The first alternate juror took part in deliberations; the second alternate juror did not. Under these circumstances, we need not address the merits of County Court's denial of defendant's challenge for cause to juror No. 57 (see People v Haardt, 129 AD3d 1322, 1322-1323 [2015]; People v Rivera, 7 AD3d 358, 359 [2004], lv denied 3 NY3d 741 [2004]; People v Henry, 116 AD2d 737, 737-738 [1986], lv denied 67 NY2d 944 [1986]). In any event, were we to reach the merits, we would find that, although juror No. 57's ability to serve impartially was called into question by her statement that she had made an assumption about defendant's guilt after reading newspaper articles, her subsequent statements provided the requisite unequivocal assurance of impartiality and, thus, County Court's denial of defendant's challenge for cause was appropriate (see People v Russell, 55 AD3d 940, 940-941 [2008], lv denied 11 NY3d 900 [2008]).

Defendant further asserts that he was deprived of a fair trial because the People's investigators allegedly tampered with one of his potential witnesses. During the People's case-in-chief, defense counsel alerted County Court that two members of the Washington County Sheriff's Office had questioned a

---

    [4] Although the transcript is subject to varying interpretations, defendant may have mistakenly believed that he had exhausted his peremptory challenges as to the second alternate juror.

subpoenaed defense witness in the grand jury room of the courthouse as to the substance of his potential testimony. County Court promptly conducted a limited hearing to address the matter. The investigators consistently testified that they conducted a routine, follow-up interview and that they did not coerce, threaten, intimidate or otherwise engage in conduct aimed at influencing the testimony of the potential witness. The potential witness did not testify at the hearing, and defense counsel did not request that he do so. Upon the hearing's conclusion, defense counsel requested that the investigators be admonished, indicated that he "want[ed] to get through the trial" and reserved the right to make further motions after speaking with the potential witness "again." The court concluded that there was no evidence of improper conduct, and the People resumed the presentation of their case.

In this situation, the potential witness should have been called and questioned at the hearing regarding the investigators' interview. However, there is no discussion on the record as to why defense counsel did not call the potential witness at the hearing or during the course of the trial. The record also does not reveal whether defense counsel spoke with the potential witness after the hearing, and there is no offer of proof as to what the potential witness would have testified to if he had been called by defendant, including whether he would have been able to offer any exculpatory evidence. In the absence of any indication that defendant was prejudiced as a result of the interview, we cannot conclude — on this limited record — that the investigators' conduct deprived him of the right to present a defense (see People v Bounds, 100 AD3d 1523, 1524 [2012], lv denied 20 NY3d 1096 [2013]; see also People v McRoy, 121 AD2d 566, 568 [1986], lv denied 68 NY2d 771 [1986]). Moreover, as defense counsel's motion at the close of the People's proof did not assert any factual basis upon which to reopen the hearing or raise any allegations that the interview had a prejudicial impact, defendant waived any challenge to the adequacy of the hearing (see People v Gonzalez, 89 AD3d 1443, 1444 [2011], lvs denied 19 NY3d 973, 974 [2012]; People v Akleh, 297 AD2d 574, 574

[2002], lv denied 99 NY2d 579 [2003]).[5]

Defendant additionally argues that he was deprived of the effective assistance of counsel. While defense counsel did not request an accomplice charge as to Dingman (see CJI2d[NY] Accomplice as a Matter of Law), defendant failed to establish the absence of a strategic reason or other legitimate explanation for defense counsel's inaction in this regard (see People v Anderson, 120 AD3d 1549, 1549 [2014], lv denied 25 NY3d 1198 [2015]; People v Walker, 50 AD3d 1452, 1454 [2008], lv denied 11 NY3d 795 [2008]; People v Thomas, 33 AD3d 1053, 1055 [2006], lv denied 8 NY3d 885 [2007]; People v Hines, 24 AD3d 964, 966 [2005], lvs denied 6 NY3d 834, 839 [2006]). Moreover, defendant would not have derived a benefit from an accomplice charge, as there was considerable corroboration of Dingman's testimony (see People v Clarke, 101 AD3d 1646, 1647 [2012], lv denied 20 NY3d 1097 [2013]; People v Leffler, 13 AD3d 164, 165 [2004], lv denied 4 NY3d 800 [2005]). As for defendant's remaining ineffective assistance of counsel claims, we note that counsel will not be found to be ineffective on the basis that he or she failed to make an argument or motion that has little or no chance of success (see People v Brock, 107 AD3d 1025, 1029 [2013], lv denied 21 NY3d 1072 [2013]; People v Garcia, 30 AD3d 833, 835 [2006]). In the face of overwhelming proof of defendant's guilt, defense counsel advanced a clear trial strategy of challenging the evidence supporting the top counts of the indictment and the credibility of the victim and Dingman, made timely and appropriate motions, presented cogent opening and closing statements and effectively cross-examined the People's witnesses. Our review of the record as a whole reveals that defendant received meaningful representation.

---

[5] Defendant does not argue on appeal that trial counsel was ineffective for proceeding in this manner. Significantly, defense counsel did not put on any proof, and the decision not to call any witnesses may have been a strategic one. Furthermore, the victim testified that the potential witness, his wife's brother, "knew that [he] was being killed" and that defendant was going to give the potential witness money "so that [his] kids would be taken care of."

Lastly, defendant advances several meritless challenges to sentencing. Inasmuch as the People provided defendant with notice of his predicate felony convictions prior to sentencing and defendant failed to controvert any of these convictions at the time of sentencing, there was substantial compliance with CPL 400.21, and County Court properly sentenced defendant as a second felony offender (see People v Wilkins, 118 AD3d 1038, 1039 [2014], lvs denied 24 NY3d 960, 964, 965 [2014]; People v Gonzalez, 61 AD3d 1428, 1428-1429 [2009], lv denied 12 NY3d 925 [2009]).[6] Further, County Court lawfully imposed consecutive sentences for defendant's convictions of kidnapping in the second degree, attempted murder in the second degree and robbery in the second degree, as the acts underlying each of these crimes were separate and distinct (see People v Ramirez, 89 NY2d 444, 451 [1996]; People v Johnson, 117 AD3d 637, 639 [2014], lv denied 26 NY3d 930 [2015]; People v May, 263 AD2d 215, 221 [2000], lv denied 94 NY2d 950 [2000]). Considering defendant's criminal history, the callous and premeditated nature of his crimes and his lack of remorse, County Court did not abuse its discretion in imposing sentence, and we discern no extraordinary circumstances that warrant modification of the sentence in the interest of justice (see People v Rouse, 4 AD3d 553, 558 [2004], lv denied 2 NY3d 805 [2004]; People v Mileto, 290 AD2d 877, 880 [2002], lv denied 97 NY2d 758 [2002]).

With the exception of defendant's contention that the People belatedly disclosed Dingman's trial preparation videotape, which is unpreserved, defendant's remaining arguments have been examined and found to be unavailing.

Lahtinen, J.P., McCarthy, Garry and Mulvey, JJ., concur.

---

[6] Defendant's constitutional challenge to the second felony offender statute (see Penal Law § 70.06) is unpreserved.

ORDERED that the judgment is affirmed.




                    ENTER:

                    Robert D. Mayberger
                    Clerk of the Court