People v Saunders (2019 NY Slip Op 07645)





People v Saunders


2019 NY Slip Op 07645


Decided on October 24, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 24, 2019

107584

[*1]The People of the State of New York, Respondent,
v
Nigel Saunders, Appellant.

Calendar Date: September 3, 2019

Before: Egan Jr., J.P., Lynch, Clark, Mulvey and Pritzker, JJ.


John A. Cirando, Syracuse, for appellant.
Kirk O. Martin, Special Prosecutor, Owego (Sandra L. Cardone of counsel), for respondent.



Egan Jr., J.P.
Appeal from a judgment of the County Court of Broome County (Smith, J.), rendered March 27, 2015, upon a verdict convicting defendant of the crimes of burglary in the first degree, robbery in the first degree, murder in the second degree (two counts) and assault in the second degree.
At approximately 6:00 a.m. on November 4, 2013, a newspaper employee was driving on Mygatt Street in the City of Binghamton, Broome County when he encountered a young woman (hereinafter victim A) walking in the street, naked from the waist down, covered in blood and pleading for help. The driver called 911 and, while on the telephone with the dispatcher, spoke with victim A who indicated that her boyfriend (hereinafter victim B) had been killed, that she had been raped, beaten and stabbed and that the two assailants had stolen victim B's truck, a black 2001 Dodge Ram, and fled the scene. She also identified defendant as one of the two assailants. The police thereafter obtained an address for defendant; however, no one answered the door to his apartment when they attempted to locate him at approximately 9:00 a.m. A few minutes later, defendant called the Binghamton police, spoke to a police captain and agreed to voluntarily go to the police station to be interviewed. Police subsequently observed defendant exit his apartment building and, upon inquiry, he agreed to accompany them to the station. He was arrested later that day.
In December 2013, defendant and his codefendant, Julian Talamantez, were charged by indictment with, as relevant here, the crimes of burglary in the first degree, robbery in the first degree, two counts of murder in the second degree and assault in the second degree; defendant's charges were all based on a theory of accomplice liability.[FN1] Following a jury trial, defendant was convicted as charged. He was thereafter sentenced, as a second violent felony offender, to concurrent prison terms of 25 years, to be followed by five years of postrelease supervision, on each of his convictions for burglary in the first degree, robbery in the first degree and murder in the second degree (two counts). Defendant was also sentenced to a consecutive prison term of seven years, to be followed by five years of postrelease supervision, for his conviction of assault in the second degree. Defendant appeals.
Defendant contends that his convictions are not supported by legally sufficient evidence and are against the weight of the evidence because the proof at trial failed to, among other things, establish that he was present at the victims' residence on the morning in question. As defendant concedes, however, his challenge to the legal sufficiency of the evidence is unpreserved for appellate review as he only made a general motion for a trial order of dismissal at the close of the People's proof and subsequently failed to renew said motion following presentation of his own case (see People v Trappler, 173 AD3d 1334, 1334-1335 [2019]; People v Thorpe, 141 AD3d 927, 928 [2016], lv denied 28 NY3d 1031 [2016]). Nevertheless, as part of our weight of the evidence review, we must necessarily determine whether the elements of the charged crimes were proven at trial beyond a reasonable doubt (see People v Martinez, 166 AD3d 1292, 1293 [2018], lv denied 32 NY3d 1207 [2019]; People v Oliver, 135 AD3d 1188, 1190 [2016], lv denied 27 NY3d 1003 [2016]).
"In conducting a weight of the evidence review, we view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Henry, 173 AD3d 1470, 1473 [2019] [internal quotation marks and citation omitted], lv denied ___ NY3d ___ [Aug. 29, 2019]; see People v Mateo, 2 NY3d 383, 410 [2004], cert denied 542 US 946 [2004]). As relevant here, "[a] person is liable as an accomplice for the conduct of another person 'when, acting with the mental culpability required for the commission thereof, he [or she] solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct'" (People v Williams, 156 AD3d 1224, 1226 [2017], lv denied 31 NY3d 1018 [2018], quoting Penal Law § 20.00; see People v Smith, 174 AD3d 1039, 1041 [2019]). To be found guilty of burglary in the first degree, the People are required to prove that the defendant "knowingly enter[ed] or remain[ed] unlawfully in a dwelling with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he[, she] or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime" (Penal Law § 140.30 [2]). "A person is guilty of robbery in the first degree when he [or she] forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or [she] . . . [c]auses serious physical injury to any person who is not a participant in the crime" (Penal Law § 160.15 [1]). Additionally, "[a] person is guilty of murder in the second degree when[,] . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]), or when "he [or she] commits or attempts to commit robbery [or] burglary . . . and, in the course of and in furtherance of such crime or of immediate flight therefrom, he [or she] . . . causes the death of a person [that was not a participant]" (Penal Law § 125.25 [3]). Lastly, "[a] person is guilty of assault in the second degree when[,] . . . [i]n the course of and in furtherance of the commission or attempted commission of a felony, . . . or of immediate flight therefrom, he, [she] or another participant[,] if there be any, causes physical injury to a person other than one of the participants" (Penal Law § 120.05 [6]).
The evidence introduced at trial established that defendant and victim B had been friends since childhood. In April or May 2013, following the death of victim B's mother, defendant moved into the residence that victim A and victim B shared. In June 2013, however, the victims made a complaint to police against defendant after approximately $7,000 went missing from their home; they had not otherwise seen or heard from defendant since the complaint. Defendant was subsequently incarcerated for an unrelated parole violation and, following his release from jail, he sent a Facebook message to victim B's sister on October 8, 2013 blaming victim B for him having been sent back to jail and threatening that he was going to "f**k [victim B] up." Approximately one month later, on the evening of November 3, 2013, defendant visited his friend, Jason Deskin, in order to, among other things, obtain a gun because he had a "score" to settle with "people that he lived with before." Although Deskin had no gun, he did ask defendant to get him heroin and, a couple hours later, Deskin and his girlfriend rode with another friend to pick up defendant and Talamantez — who lived together — to go get drugs, dropping them off around the corner from the victims' residence at approximately 1:00 a.m.[FN2]
Meanwhile, having gone to bed at approximately 10:30 p.m. the prior evening, the victims were awakened in the middle of the night when two men wearing ski masks busted into their bedroom yelling "DEA." The two men attacked the victims, beating them and shocking them with tasers. Victim A was brought into the upstairs hallway and told to sit down, as her hands were tied behind her back, while Talamantez continued to beat victim B. When the individual tying her hands behind her back asked victim A where the victims' money and marihuana were located, she immediately recognized the voice as that of defendant, her former roommate. She subsequently showed defendant where the victims' money was, and defendant took the $1,000 that they had in their bedroom. Defendant and Talamantez then led the victims to a small room in the basement, where defendant tied their ankles together. While defendant went upstairs, Talamantez raped victim A and then locked the victims in the basement room and returned upstairs. Sometime later, defendant and Talamantez reappeared and defendant struck victim A in the head with a machete, before leaving again. The victims were ultimately able to untie their restraints, but, when Talamantez again returned, victim B unsuccessfully attempted to rush him, whereupon Talamantez began repeatedly stabbing victim B, ultimately severing his carotid artery, killing him. Talamantez then stabbed victim A multiple times in the stomach, arm, leg and back and then once again left the room. When Talamantez returned, victim A attempted to "play[] dead," but Talamantez subsequently poured a "gassy fluid" over both her and victim B and lit it on fire, causing her to jump away from the fire. Talamantez then pushed her back in the room, locked the door and left. Victim A subsequently heard victim B's truck start and drive away, and she was ultimately able to break a small basement window and escape. Following the arrival of emergency personnel, she immediately identified defendant as one of the assailants.[FN3]
At approximately the same time, Theresa Papio, defendant and Talmantez's roommate, observed defendant and Talamantez outside of their apartment unloading property from a black truck — which property and truck were later determined to be stolen from the victims' residence — into their apartment. Talamantez was covered in blood and she observed him change his bloody clothes, place them in a garbage bag and dispose of them in a nearby dumpster. Defendant was arrested later that day. Five days after his arrest, defendant's girlfriend returned to defendant's apartment after visiting him in jail and, per his instructions, retrieved certain blood-stained money that he had hidden in the ceiling above his bedroom. Although a different verdict would not have been unreasonable, given the lack of forensic evidence linking defendant to the crime scene, when viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we find that the evidence presented at trial overwhelmingly established defendant as one of the perpetrators and we are satisfied that his convictions are supported by the weight of the evidence (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Smith, 174 AD3d at 1042-1043; People v Ackerman, 173 AD3d 1346, 1350 [2019], lv denied ___ NY3d ___ [Sept. 5, 2019]).
Defendant next contends that County Court abused its discretion when it failed to conduct the requisite minimal inquiry before denying his request for the substitution of assigned counsel. We disagree. The determination of whether an indigent defendant is entitled to substitution of assigned counsel is a decision within the sound discretion of the trial court (see People v Porto, 16 NY3d 93, 99-100 [2010]; People v Matthews, 159 AD3d 1111, 1116 [2018]). "To warrant the substitution of assigned counsel, defendant was required to make specific factual allegations of serious complaints about counsel. If such a showing is made, the court must make at least a minimal inquiry, and discern meritorious complaints from disingenuous applications by inquiring as to the nature of the disagreement or its potential for resolution" (People v Puccini, 145 AD3d 1107, 1109 [2016] [internal quotation marks and citations omitted], lv denied 29 NY3d 1035 [2017]; see People v Alberts, 161 AD3d 1298, 1305 [2018], lv denied 31 NY3d 1114 [2018]).
Defendant submitted a letter to County Court indicating that he was having issues with his assigned defense counsel, stating generally that counsel was not "representing [him] with [his] best interest at hand . . . [and had] made it clear he's trying to get me a plea bargain" and that the matter had been on the court's trial calendar "forever." At the next court appearance following receipt of defendant's letter, County Court reminded defendant that, at his December 2013 arraignment, both defendant and defense counsel had indicated that this was going to be "a definite trial" case and that, since such time, no plea conference had been conducted and no plea offer had been extended by the People. County Court also made inquiry of defendant and defense counsel and confirmed that, to date, defense counsel had provided defendant with copies of all relevant motions, as well as hundreds of pages of additional discovery material. At no point during this colloquy did defendant raise any other specific objections to, or wrongdoing associated with, defense counsel's representation.[FN4] Accordingly, given defendant's failure to articulate any serious complaints regarding counsel's representation or otherwise demonstrate the existence of good cause justifying the substitution of his assigned counsel, we find that County Court appropriately exercised its discretion in denying defendant's request for new counsel (see People v Smith, 18 NY3d 588, 593 [2012]; People v Lanier, 158 AD3d 895, 896-897 [2018]; People v Puccini, 145 AD3d at 1109).
Defendant was not deprived of a fair trial as a result of County Court's various evidentiary rulings. "Trial courts are accorded wide discretion in making evidentiary rulings and, absent an abuse of discretion, those rulings should not be disturbed on appeal" (People v Carroll, 95 NY2d 375, 385 [2000]; accord People v Strife, 167 AD3d 1095, 1097 [2018]; People v Collins, 126 AD3d 1132, 1133 [2015], lv denied 25 NY3d 1161 [2015]). With respect to County Court's Molineux ruling, "[i]t is well settled that evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions — motive, intent, absence of mistake, common plan or scheme and identity — or where such proof is inextricably interwoven with the charged crimes, provides necessary background or completes a witness's narrative" (People v Turner, 172 AD3d 1768, 1771-1772 [2019] [internal quotation marks and citations omitted], lvs denied ___ NY3d ___, ___ [Aug. 23, 2019]; see People v Frankline, 27 NY3d 1113, 1115 [2016]; People v Gannon, 174 AD3d 1054, 1058 [2019]). Here, the video of defendant's interview with police, and the corresponding transcript thereof wherein he admits to having previously possessed and used drugs with the victims, was information relevant and material to the issues of both motive and intent and provided necessary background information regarding the nature of defendant's relationship with the victims (see People v Higgins, 12 AD3d 775, 778 [2004], lv denied 4 NY3d 764 [2005]). Moreover, defendant thereafter declined County Court's invitation to provide a limiting instruction to the jury regarding the references to this uncharged criminal conduct. Therefore, under the circumstances, we cannot say that the court's ruling constituted an abuse of discretion.[FN5]
We further find that County Court properly exercised its discretion in denying defendant's motion in limine seeking to present the testimony of an expert witness on voice identification. Although there was no scientific or DNA evidence presented at trial linking defendant to the crime scene, victim A identified defendant's voice as one of the masked perpetrators of the subject crimes, and her identification was corroborated by ample other evidence connecting defendant to the crime, including his threatening Facebook message to victim B's sister, having been dropped off near the crime scene on the morning in question, his roommate observing him unloading the victims' stolen property from victim B's truck and possessing blood-stained money. Accordingly, given the strength of the corroborating evidence connecting defendant to the commission of the subject crimes, we find no abuse of discretion in County Court's decision to exclude testimony from defendant's voice identification expert (see People v Santiago, 17 NY3d 661, 669-671 [2011]; People v Solano, 138 AD3d 525, 526 [2016], lv denied 27 NY3d 1155 [2016]; see also People v Abney, 13 NY3d 251, 267-268 [2009]; People v LeGrand, 8 NY3d 449, 455 [2007]).
Nor do we find that the admission of three photographs (People's exhibit Nos. 56, 57 and 147) were so unduly prejudicial as to require a reversal of defendant's conviction. First, People's exhibit No. 147, a photograph of victim A's post-surgery elbow wound, was relevant and material to the charge of assault in the second degree in that it demonstrated the seriousness of victim A's injuries (see Penal Law § 120.05; People v Greenfield, 167 AD3d 1060, 1063 [2018], lv denied 32 NY3d 1204 [2019]). Second, even assuming, without deciding, that the prejudicial value of admitting People's exhibit Nos. 56 and 57 — which show the layout of the crime scene, including victim B's body — outweighed the probative value of same, given the overwhelming proof of defendant's guilt, we find any such error to be harmless, as there was no significant probability that the jury would have acquitted defendant but for the admission of these exhibits (see People v Tackentien, 114 AD3d 1259, 1259 [2014], lv denied 23 NY3d 1025 [2014]; People v Stevens, 153 AD2d 768, 770 [1989], affd 76 NY2d 833 [1990]; see generally People v Crimmins, 36 NY2d 230, 241-242 [1975]).
We reject defendant's contention that he was not afforded meaningful representation. "A claimed violation of the constitutional right to the effective assistance of counsel will not survive judicial scrutiny so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Pitt, 170 AD3d 1282, 1286 [2019] [internal quotation marks and citation omitted], lv denied 33 NY3d 1072 [2019]). Here, the record was insufficient to establish a prima facie case of discrimination under Batson, and counsel will not be found to have been ineffective based upon failing to make a motion that had little or no chance of success (see People v Stultz, 2 NY3d 277, 287 [2004]; People v Dorsey, 3 AD3d 590, 591-592 [2004]). Additionally, in light of our determination that defendant's conviction was not against the weight of the evidence, counsel's failure to preserve defendant's legal sufficiency claim does not constitute the ineffective assistance of counsel (see People v Williams, 156 AD3d at 1231). Defendant's counsel made appropriate pretrial motions, opposed the People's Molineux application, adequately represented defendant during jury selection, made appropriate objections at trial, thoroughly cross-examined witnesses and provided cogent opening and closing statements, consistently pursuing a trial strategy of attempting to establish that defendant was not present at the victims' residence when the subject crimes were alleged to have occurred. Accordingly, viewing the record in its entirety, we are satisfied that defendant was provided with meaningful representation (see People v Benevento, 91 NY2d 708, 712 [1998]; People v Ash, 162 AD3d 1318, 1322 [2018], lv denied 32 NY3d 1002 [2018]; People v Anthony, 152 AD3d 1048, 1053 [2017], lvs denied 30 NY3d 978, 981 [2017]).
Finally, given the brutal and senseless nature of the crimes committed, defendant's prior criminal history and his failure to accept any responsibility for these violent crimes, we discern no extraordinary circumstances or abuse of discretion that would warrant a reduction of the sentence imposed in the interest of justice (see People v Malloy, 166 AD3d 1302, 1311 [2018], affd 33 NY3d 1078 [2019]; People v Robinson, 156 AD3d 1123, 1131-1132 [2017], lv denied 30 NY3d 1119 [2018]; People v Nelligan, 135 AD3d 1075, 1078 [2016], lv denied 27 NY3d 1072 [2016]). To the extent not specifically addressed, defendant's remaining contentions have been reviewed and found to be without merit.
Lynch, Clark, Mulvey and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Following his indictment, defendant moved to sever his trial from that of Talamantez; however, Talamantez subsequently pleaded guilty, rendering said motion moot.

Footnote 2: After dropping defendant and Talamantez off near Mygatt Street, Deskin, his girlfriend and the other friend waited at a local gas station for defendant and Talamantez to return with the drugs but, after approximately 45 minutes passed without any response from defendant and Talamantez, they drove home.

Footnote 3: Upon admission to the hospital, victim A was determined to have a combination of penetrating and blunt force injuries, including open wounds to her scalp and face that required numerous staples to close, 22 or 23 stab wounds and puncture wounds to her chest, abdomen, hand, back and thighs, a fractured middle finger and a large gash over her left elbow stemming from a compound elbow fracture.

Footnote 4: County Court further noted that defense counsel had conducted multiple trials before the court, was a competent attorney and had always provided effective representation.

Footnote 5: Defense counsel specifically indicated that he did not want a limiting instruction so as not to draw attention to the subject statements.