(October 16, 2014)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLI ADAMES, Appellant. [994 NYS2d 334]—

Judgment, Supreme Court, New York County (Lewis Bart Stone, J., at suppression motion; Daniel P. Fitzgerald, J., at jury trial and sentencing), rendered June 24, 2011, convicting de-

fendant of criminal possession of a weapon in the second degree, and sentencing him to a term of eight years, unanimously reversed, on the law, and the matter remanded for a new trial.

The primary issue addressed on this appeal concerns whether defendant's written and videotaped statements should have been suppressed. For the reasons stated below, we find the People failed to establish a knowing and intelligent waiver of defendant's *Miranda* rights.

On June 24, 2008 at approximately 2:00 a.m., defendant, an 18-year-old with no prior criminal history, went to 200 Eldrige Street with his cousin Ricardo Martinez and three other men. Ricardo Martinez was armed with a loaded gun. Two days earlier, defendant had a fight in that neighborhood with several individuals, including Vincent Cruz. Defendant and the four men approached Diana Vargas in front of 200 Eldridge Street where a conversation ensued. Moments later, Cruz came out of a building on 200 Eldridge Street armed with several knives. Martinez then fired five shots at Cruz. One of the gunshots struck Cruz in the neck and severed his carotid artery, causing his death.

On July 10, 2008, the People filed a grand jury indictment charging defendant with manslaughter in the first degree, manslaughter in the second degree, gang assault in the first degree and two counts of criminal possession of a weapon in the second degree.

A *Huntley/Dunaway/Wade/Cruz* hearing was conducted in response to defendant's motion to suppress his statements made to the police and the District Attorney's Office. Detective William McNeeley testified that at approximately 1:00 p.m. on June 24, 2008, he and Detective Brian Macleod went to defendant's apartment in Brooklyn as part of the investigation into the shooting death of Vincent Cruz. Defendant agreed to return with the detectives to the police station, and upon their arrival, he was placed in an interview room without handcuffs, was provided with a glass of water and was allowed to eat a container of food prepared by his grandmother. The detectives spoke in English, defendant responded in English and McNeeley testified that defendant had no trouble understanding anything that was said.

Before questioning commenced, McNeeley, in the presence of two other detectives, read defendant his *Miranda* rights from a preprinted sheet of paper. McNeeley testified that defendant remained uncuffed, no threats or promises were made to him by any of the detectives and none of the detectives had their weapons drawn. Prior to advising him of his *Miranda* rights,

McNeeley instructed defendant that he would be asked a question after each right had been read, and defendant was to write down a response of either "yes" or "no." Defendant indicated that "he couldn't write." McNeeley then offered to write defendant's answers for him. Defendant answered "yes" each time he was asked if he understood a particular right, and he wrote his initials on the preprinted *Miranda* form next to where McNeeley had written "yes" on defendant's behalf. Thereafter, McNeeley commenced questioning and defendant gave a statement regarding his actions and whereabouts starting on June 23, 2008, in which defendant, among other things, indicated that he had not been in Manhattan.

At the conclusion of defendant's narrative, McNeeley asked if defendant was "sure" that he had given an "accurate account" because "he was seen over there [on Eldridge Street] by people he knows and doesn't know, and he was involved in an incident where there was a fight." In response, defendant stated that "he wanted to be truthful, and he [would] tell [McNeeley] everything that happened." Defendant then provided a second statement regarding his recent activities, in which he acknowledged, among other things, his involvement in an altercation that took place on Eldridge Street during which an individual named Jorge, armed with "three kitchen knives in his hands," confronted defendant and his friends causing them to flee. When McNeeley asked defendant if he had heard a gunshot as he ran away, defendant initially answered, "No." McNeeley then told defendant that the "guy that had the three kitchen knives was shot, and that there [wa]s no way [defendant] could have run far enough away [and defendant] was there because he was seen out there during the incident."

McNeeley asked defendant if he was the individual with the knives or was it somebody else who shot him, to which defendant responded that he "didn't know they shot him." McNeeley said to defendant that he had to have known that the individual was shot and defendant said that he did not shoot anybody. When McNeeley asked "who did it if you didn't do it," defendant answered, "I don't know. Must have been Argenis because he had a shirt wrapped around his hand and I didn't see the gun."

McNeeley again asked defendant if he was being truthful "because his freedom depended upon it, and that he is looking at a heavy assault charge . . . and if [the man who was shot] dies you know it could be very serious." At that point in the interview, defendant said, "Oh, no. Oh, my God. I want to be so truthful with you, I'm ready to tell you the whole truth." McNeeley stopped the "verbal account" at that time.

McNeeley testified that he then asked defendant if he would like to give a written statement. Defendant responded that "he doesn't write, and he asked [McNeeley] if [he] would write it down." McNeeley told him that he would write it and then read it back to him to ensure that it was accurate. When McNeeley subsequently read back the written statement to defendant, he had no objections or corrections. McNeeley claimed that defendant "never asked for an attorney" and he could not recall if defendant had ever expressed any interest in speaking with the "[D]istrict [A]ttorney."

Approximately five hours after giving his written statement, defendant was questioned by Assistant District Attorney Elliot in a videotaped interview. Elliot began by introducing herself as a "[D]istrict [A]ttorney" and stating, "I understand that you wanted to speak to me right?," to which defendant replied, "Yes, Miss." Elliot, although noting that she had been advised by the detectives that defendant had already been read his *Miranda* warnings, indicated that she was going to give them to him again to make sure that he was "aware" of them before they had a "conversation." Defendant acknowledged that he understood that he had the right to remain silent and that anything he said could be used against him. Next, Elliot asked him whether he understood that he had the right to consult an attorney before speaking to her and to have an attorney present during questioning. The following exchange took place:

"ADA: You have a right to consult an attorney before speaking to the police or me and have an attorney present during any questioning. Do you understand that?

"DEFENDANT: No. I want [sic] have a couple of questions.

"ADA: Go ahead. What's your question?

"DEFENDANT: I want my question privates [sic] though. It's gotta be me and you. If it's okay.

"ADA: Uh. Well. Okay. If you want to—I mean I'm here because you wanted to speak with me, right? And so I'm happy to answer any questions that you have. That's part of the reason why I'm here. My understanding is you might have some questions for me. These questions that I have for you are different. These are—you've already been asked these questions.

"DEFENDANT: Oh yeah.

"ADA: So I'm only—I want to just make sure that you understand.

"DEFENDANT: Yes.

"ADA: The—you know—your rights basically.

"DEFENDANT: Yes.

"ADA: So—do you—do you understand that you have the right to consult an attorney before speaking to the police or me? Do you—do you understand that?

"DEFENDANT: What does that mean?

"ADA: That means that—I know you asked to speak with me and I'm here. I'm here now to speak with you.

"DEFENDANT: Okay.

"ADA: But you have the right to consult an attorney before speaking to the police or me.

"DEFENDANT: What's an attorney is you [sic]. What's an attorney.

"ADA: I am an attorney.

"DEFENDANT: Okay.

"ADA: But you have the right to speak to a different attorney. Your own attorney if you would like before you speak to me.

"DEFENDANT: I can do that?

"ADA: You can do that.

"DEFENDANT: There's another one here?

"ADA: There is not another one here. The—the—practically speaking, if you want to speak to an attorney before speaking to me we are not going to be able to have a conversation. We're not going to be able to talk now.

"DEFENDANT: Oh. Okay. So let's talk now. Let's—to see if I could . . .

"ADA: But do you understand that—

"DEFENDANT: Yes miss.

"ADA: Okay. Do you—do you want an attorney now or do you not want an attorney now and you would like to speak with me?

"DEFENDANT: No I will speak with you. It's alright.

"ADA: Okay. Now if you can't afford one do you understand that one would be provided for you?

"DEFENDANT: Oh. Okay.

"ADA: So you're obviously. You asked to speak with me so I assume that you have some questions for me. Right? You have questions for me?

"DEFENDANT: No. It's okay. Go ahead answer [sic] your questions first."

Thereafter, defendant gave a narrative similar to the written statement that he had previously given to the detectives, except that now he claimed that he saw Martinez, not Argenis, pull out a gun and shoot five times. At several points during the

videotaped interview, Elliot expressed doubt as to the truth of defendant's statements and urged him to be honest.

The court issued a written decision finding McNeely to be a credible witness. As for defendant's written statements, the court found no basis in the record for finding that defendant did not understand the *Miranda* warnings or the statements that he initialled, noting that defendant called no witnesses to support his contention that his illiteracy and low intelligence rendered him unable to understand the rights that he was waiving. As for defendant's videotaped statement, the court rejected defendant's contentions that he "was of too low intelligence" to understand the rights that he was waiving, and that Assistant District Attorney Elliot misled him into believing that speaking to her was the equivalent of speaking to his own attorney as unsupported by the record. The court determined that "there was no evidence introduced by either the People or Adames as to Adames' intelligence quotient or his cognitive abilities." The court rejected defendant's contention that he invoked his right to counsel, finding defendant's statements to be "equivocal." The court emphasized that the Assistant District Attorney had conveyed to defendant that they could stop speaking and obtain an attorney for defendant but he chose to continue speaking and to not consult an attorney.

After a jury trial, defendant was ultimately convicted of criminal possession of a weapon in the second degree.

We find the People failed to establish that defendant made a knowing and intelligent waiver of his *Miranda* rights prior to giving his oral, written and videotaped statements. The People have a heavy burden to demonstrate that the defendant's waiver was knowing, intelligent, and voluntary (*People v Davis*, 75 NY2d 517, 523 [1990]). Here, the court credited hearing testimony that after each right was read aloud to defendant, he understood each one and memorialized his understanding by writing his initials next to each right on the preprinted *Miranda* waiver form even while considering defendant's illiteracy. Nevertheless, we find to the contrary and determine that defendant did not understand the "immediate import" of the *Miranda* warnings, especially when considering the video statement which established defendant did not understand the word "attorney" nor his right to consult an attorney before questioning (*People v Williams*, 62 NY2d 285, 289 [1984]). In light of our finding that defendant did not understand his right to counsel immediately before the video statement, it follows that defendant's previous statements made at the police precinct are also suppressed.

The video statement documents defendant's manner and speech, which indicates confusion surrounding the right to counsel. At the beginning of the video statement, defendant stated that he did not understand his right to counsel. ADA Elliot asked, "You have a right to consult an attorney before speaking to the police or me and have an attorney present during any questioning. Do you understand that?" Defendant responded, "No." He followed up this declaration and stated, "I want [sic] have a couple of questions." ADA Elliot inquired, "What's your question?" Defendant stated, "I want my question privates [sic] though. It's gotta be me and you. If it's okay." This request to speak in private, immediately after expressing that he did not understand his right, indicates defendant's belief that the Assistant District Attorney was his counsel. ADA Elliot did not acknowledge this confusion. Instead, Elliot responded as follows: "Uh. Well. Okay. If you want to—I mean I'm here because you wanted to speak with me, right? And so I'm happy to answer any questions that you have. That's part of the reason why I'm here. My understanding is you might have some questions for me. These questions that I have for you are different. These are—you've already been asked these questions." Later in the colloquy Elliot acknowledged defendant's confusion and asked, "[D]o you understand that you have the right to consult an attorney before speaking to the police or me?" Defendant responded, "What does that mean?" Again, defendant indicated that he did not know or understand right to counsel.

Rather than restate or explain the right to counsel, Elliot stated, "That means that—I know you asked to speak with me and I'm here. I'm here now to speak with you." Elliot further stated, "But you have the right to consult an attorney before speaking to the police or me." In response, defendant asked, "What's an attorney?" Elliot answered, "I am an attorney." Without further explanation, the People's answer to the defendant's questions failed to clarify his understanding of the right to counsel.

Next, Elliot attempts to explain the right to counsel by stating, "But you have the right to speak to a different attorney. Your own attorney if you would like before you speak to me." Defendant expressed surprise and quizzically responded, "I can do that?" To this point, it is self-evident that defendant could not have understood his right to counsel prior to his written or oral statement.

Given defendant's failure to comprehend his right to counsel, we must examine whether Elliot informed defendant of his right to counsel in "clear and unequivocal terms" before the video

statement (*Miranda v Arizona*, 384 US 436, 467-468 [1966]). Defendant asked Elliot, "There's another [attorney] here?" Elliot states, "There is not another one here . . . if you want to speak to an attorney before speaking to me we are not going to be able to have a conversation." This statement provides defendant some information about his right to counsel, but viewed in light of defendant's prior statements which indicate that he did not fully comprehend his right to counsel or the word "attorney," Elliot's attempt to provide further explanation was insufficient.

Eventually, defendant does respond that he will speak with ADA Elliot. However, it is not clear that this 18-year-old defendant with no prior criminal history, who could not read or write, ever understood his right to counsel nor the consequences of waiver. The evidence shows that defendant responded "yes" to questions when asked if he understood his rights. Then, immediately afterwards, defendant expressed confusion in understanding his right to counsel. As such, the People failed to present evidence that established defendant sufficiently understood the immediate import of the *Miranda* warnings. Moreover, ADA Elliot's explanations failed to clarify for defendant the concept of his right to counsel. Thus, given defendant's age, illiteracy, unfamiliarity with the criminal justice system, and statements expressing confusion about his *Miranda* rights, it is evident that the People failed to establish a knowing and intelligent waiver of *Miranda* rights (*see e.g. People v Santos*, 112 AD3d 757 [2d Dept 2013]).

Moreover, under the facts of this case, the erroneous admission of defendant's statements into evidence at trial was not harmless beyond a reasonable doubt (*see People v Crimmins*, 36 NY2d 230, 237 [1975]).

In view of the foregoing, we find it unnecessary to reach defendant's remaining contentions. Concur—Sweeny, J.P., Acosta, Saxe, Manzanet-Daniels and Clark, JJ.