People v Durfey (2019 NY Slip Op 01855)





People v Durfey


2019 NY Slip Op 01855


Decided on March 14, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 14, 2019

109165

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
RYAN M. DURFEY, Appellant.

Calendar Date: January 14, 2019

Before: Garry, P.J., Egan Jr., Lynch, Clark and Pritzker, JJ.


Del Atwell, East Hampton, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (William D. VanDelinder of counsel), for respondent.



MEMORANDUM AND ORDER
Pritzker, J.
Appeals (1) from a judgment of the County Court of Chemung County (Rich Jr., J.), rendered January 27, 2017, upon a verdict convicting defendant of the crime of unlawful manufacture of methamphetamine in the third degree, and (2) from a judgment of said court, rendered April 14, 2017, which resentenced defendant.
Defendant was charged by indictment with unlawful manufacture of methamphetamine in the third degree stemming from an unrelated search of defendant's family barn during which a state trooper discovered several items that he believed to be associated with the manufacture of methamphetamine. Following a Huntley hearing and a jury trial, defendant was convicted as charged and ultimately sentenced to a prison term of 3½ years, followed by two years of postrelease supervision. Defendant now appeals.
Defendant contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence in that the People failed to prove that he constructively possessed the contraband found in the barn. When reviewing a legal sufficiency claim, this Court views the evidence "in the light most favorable to the People and evaluate[s] whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Haggray, 164 AD3d 1522, 1524 [2018] [internal quotation marks and citations omitted], lv denied 32 NY3d 1111 [2018]; see People v Croley, 163 AD3d 1056, 1056 [2018]). A weight of the evidence review requires this Court to review all of the credible evidence and determine whether a different conclusion would not have been unreasonable (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Briggs, 129 AD3d 1201, 1204 [2015], lv denied 26 NY3d 1038 [2015]). Where a different conclusion would not have been unreasonable, this Court must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d at [*2]495 [internal quotation marks and citation omitted]; see People v Thorpe, 141 AD3d 927, 929 [2016], lv denied 28 NY3d 1031 [2016]).
As relevant here, "[a] person is guilty of unlawful manufacture of methamphetamine in the third degree when he or she possesses at the same time and location, with intent to use, or knowing that another intends to use each such product to unlawfully manufacture, prepare or produce methamphetamine . . . [t]wo or more items of laboratory equipment and two or more precursors, chemical reagents or solvents in any combination" (Penal Law § 220.73 [1]). Where, like here, a defendant is not found to be in physical possession of any of the seized items, "the People have to establish that [the] defendant constructively possessed the items by showing that he [or she] exercised dominion or control over the property by a sufficient level of control over the area in which the contraband [was] found" (People v Alberts, 161 AD3d 1298, 1300 [2018] [internal quotation marks and citation omitted], lv denied 31 NY3d 1114 [2018]; see People v Pinkney, 90 AD3d 1313, 1314 [2011]). To determine constructive possession, courts may consider "the defendant's proximity to the contraband, whether the defendant had keys to the location where the contraband was found, whether the contraband was in plain view . . . and whether there is witness testimony that the contraband belonged to the defendant" (People v Maricle, 158 AD3d 984, 986 [2018]). "Exclusive access, however, is not required to sustain a finding of constructive possession" (People v Victor, 139 AD3d 1102, 1105 [2016], lv denied 28 NY3d 1076 [2016]).
The testimony at trial established that, Alex Krawczyk, a state trooper, was asked to report to an address located on Hall Road in the Town of Veteran, Chemung County (hereinafter the property) to assist in investigating a report of a stolen go-cart. Krawczyk testified that, at the property, there was a primary residence as well as two barns. Krawczyk explained that one of the barns was closer to the residence and the road and that the other barn was further away from both the residence and the road. When Krawczyk first arrived at the property, he parked in front of the residence and did not see anyone, but after looking around, he saw defendant, who was talking to a police officer also investigating the missing go-cart, standing in front of the barn furthest from the road and the residence (hereinafter the barn). When Krawczyk joined the conversation, defendant verified that there was a go-cart in the barn and invited Krawczyk and the other police officer into the barn to look at the go-cart.
While in the barn, Krawczyk, who was "trained to identify possible meth-making materials and possible meth labs," saw items that he believed to be associated with the manufacture of methamphetamine, including cut lithium batteries, and a plastic bottle with brownish fluid inside that looked like exposed chemicals and a one-pot production of methamphetamine. After viewing these items, Krawczyk called Kevin Backer, another state trooper who was a member of the Contaminated Crime Scene Emergency Response Team, and requested that he come to the property. Krawczyk testified that it took Backer approximately 1½ hours to arrive and that, while he and the other police officer waited for Backer, they let defendant go back to work replacing some timber and meandering around the property. Krawczyk testified that defendant, who was not handcuffed or detained in any way, was usually within eyesight and that he sometimes went into the barn.
Backer testified that, upon his arrival, he looked around the barn and observed several items consistent with the manufacture of methamphetamine, including the battery casings on the floor and a bottle of acid. Backer testified that he then called and requested a team to come to the property to assist with a search. Krawczyk testified that, after Backer called for assistance, Krawczyk detained defendant in his troop car and then proceeded to make contact with defendant's father, mother and brother, who were all in the residence. During this time, defendant's father, who owned the property, gave verbal and written consent to search the property, including the barn. Backer testified regarding the search and all of the items of contraband that were seized from the barn as a result. In addition, Krawczyk testified that, after obtaining consent to search from defendant's father, he brought defendant to the State Police barracks where defendant was interviewed and ultimately signed a written statement. During the interview, Krawczyk learned that defendant lived at the property on and off and that the Hall [*3]Road address was listed as his mailing address. Krawczyk also testified that defendant informed him that he worked in the barn and had full access to it.
Viewing the evidence in a light most favorable to the People, we find that the testimony that defendant lived on the property, listed it as his mailing address, worked in the barn and was familiar enough to know that a go-cart was inside the barn provided legally sufficient evidence that defendant exercised dominion and control over the barn where the contraband was found such that he constructively possessed the contraband (see People v Victor, 139 AD3d at 1106; People v Miller, 13 AD3d 890, 891 [2004]). As to weight of the evidence, it would not have been unreasonable for the jury to have acquitted defendant, as it could have found that defendant did not have dominion or control over the barn because the testimony revealed that other people had access to the barn (see People v Graham, 138 AD3d 1242, 1243 [2016], lv denied 28 NY3d 930 [2016]). However, viewing the foregoing evidence in a neutral light and deferring to the jury's credibility determinations, we do not find that the verdict is against the weight of the evidence (see People v Cochran, 140 AD3d 1198, 1200 [2016], lvs denied 28 NY3d 970 [2016]; People v Graham, 138 AD3d at 1243).
To the extent that defendant is arguing that County Court erred in refusing to suppress his written statement, we disagree. Where a defendant is read his or her rights from a preprinted card prior to any questioning, a "defendant's unambiguous acknowledgment that he [or she] understood his [or her] rights and subsequent participation in answering . . . questions constitute[s] an implicit waiver of his [or her] Miranda rights" (People v Green, 141 AD3d 1036, 1038 [2016], lv denied 28 NY3d 1072 [2016]; compare People v Adames, 121 AD3d 507, 512 [2014]). However, "where an improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a 'single continuous chain of events,' there is inadequate assurance that the Miranda warnings were effective in protecting a defendant's rights, and the warned statement must also be suppressed" (People v Paulman, 5 NY3d 122, 130 [2005], quoting People v Chapple, 38 NY2d 112, 114 [1975]). To establish whether the "subsequent written statement was part of a single continuous chain of events requiring its suppression, courts look to numerous factors, including the time differential between the Miranda violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the Miranda violation, such as the extent of the improper questioning; and whether, prior to the Miranda violation, the defendant had indicated a willingness to speak to police" (People v Harris, 141 AD3d 1024, 1028-1029 [2016] [internal quotation marks, brackets and citation omitted]).
Here, defendant requested suppression of two statements, one oral and one written and, after a Huntley hearing, County Court suppressed defendant's oral statement on the basis that defendant had not been given his Miranda warnings. However, the court found that there was "more than sufficient attenuation" between that statement and a subsequent written statement and, as such, it did not suppress the written statement. The evidence at the Huntley hearing established that the oral statement was made after Backer arrived at the property and first surveyed the barn. Krawczyk testified that he, defendant and Backer were walking up to the road from the barn. Defendant was not handcuffed and had been cooperative since Krawczyk's arrival at the scene that morning. While they were walking, Krawczyk asked defendant "what's really going on in this barn" and "why [he was] on the [pseudoephedrine] logs so many times?" Krawczyk testified that he had learned about these logs from Backer. Defendant responded, "I don't know . . . for a cook."
Once they got to the road, Krawczyk detained defendant in his troop car. Krawczyk testified that, after he detained defendant, he left defendant alone in the troop car and went to speak with defendant's father, mother and brother. After a while, Krawczyk returned to his car, entered the vehicle and immediately administered Miranda warnings to defendant. Krawczyk read the warnings from a preprinted card and, after doing so, defendant responded that he understood his rights. Shortly thereafter, Krawczyk transported defendant to the barracks, which was a 20- to 30-minute drive, during which Krawczyk did not question defendant. Upon [*4]arrival at the barracks, defendant was brought to an interview room and Krawczyk asked him if he wanted to give his side of the story. The testimony established that this process involved Krawczyk asking questions and defendant answering them while Krawczyk typed all of it on a computer. In the process, Krawczyk again administered Miranda warnings to defendant, which were printed on the written statement form. Krawczyk further testified that, after the statement was given, defendant initialed next to each line of the Miranda warnings, and Krawczyk went through every line of the statement with defendant, who signed under the Miranda warnings and again at the end of the statement. Krawczyk's testimony established that defendant was cooperative, relaxed and never attempted to interrupt or stop the process. Finally, a review of defendant's written statement establishes that Krawczyk's questions were primarily based on the contraband that was in plain view in the barn. Defendant was also asked questions about his name appearing on the pseudophedrine log.[FN1]
This testimony established that defendant unambiguously acknowledged that he understood his Miranda rights because he responded affirmatively both times, initialed next to each line of the Miranda warnings on the written statement and participated in answering Krawczyk's questions, amounting to an implicit waiver of his Miranda rights (see People v Green, 141 AD3d at 1038). Further, the written statement was sufficiently attenuated from the unwarned oral statement because the statements were not part of a single continuous chain of events; defendant was transported to the barracks and questioned in a separate environment and, during the course of this questioning, the oral statement was not exploited, as defendant was primarily questioned based on evidence that was in plain view, as well as evidence that had been obtained independently of the unwarned oral statement (see People v Harris, 141 AD3d at 1028-1029; People v Cavanagh, 97 AD3d 980, 982 [2012], lv denied 19 NY3d 1101 [2012]).
We also disagree with defendant's argument that he had a right to a Mapp hearing. "The trial court 'may summarily deny [a] motion [to suppress evidence] if . . . [t]he motion papers do not allege a ground constituting a legal basis for the motion [or if the] sworn allegations of fact do not as a matter of law support the ground alleged'" (People v Godallah, 132 AD3d 1146, 1148 [2015], quoting CPL 710.60 [3] [a], [b]). In his request for a Mapp hearing, defendant alleged that law enforcement unlawfully entered the property and, as such, all property seized in the search must be suppressed. However, rather than set forth facts supporting this allegation, defendant acknowledged that his father was the property owner and that law enforcement obtained consent from his father to search the premises and seize the property therein. Accordingly, County Court properly denied defendant's motion for a Mapp hearing, as the motion "failed to set forth any sworn allegations of fact supporting the grounds for the application" (People v Gilmore, 72 AD3d 1191, 1192 [2010]; see CPL 710.60 [3] [b]; People v Mendoza, 82 NY2d 415, 422 [1993]).
We are also unpersuaded by defendant's arguments that he did not receive the effective assistance of counsel. "For counsel to be effective, he or she must provide meaningful representation as shown by an examination of the totality of the evidence, facts and law" (People v Santos-Rivera, 86 AD3d 790, 791 [2011] [internal quotation marks, brackets and citations omitted], lv denied 17 NY3d 904 [2011]). Although defendant contends that his trial counsel failed to recognize the impropriety of his incriminating statement, this contention is belied by the record, as counsel appropriately requested a Huntley hearing and, in fact, was successful in having defendant's oral statement suppressed (see People v Dean, 122 AD3d 1004, 1005 [2014]). Moreover, defendant's contention that counsel failed to obtain a Mapp hearing is unpersuasive given that defendant invited Krawczyk into the barn and defendant's father signed a consent to search, rendering a Mapp hearing unnecessary (see People v Hogan, 26 NY3d 779, 787 [2016]; see generally People v Worthington, 150 AD3d 1399, 1403 [2017], lv denied 29 NY3d 1095 [*5][2017]). We also find no merit in defendant's contention that counsel was ineffective for failing to address defendant's Antommarchi rights, as defendant does not set forth, nor does the record reveal, any material stage of the proceedings for which defendant was not present (see People v Antommarchi, 80 NY2d 247, 250 [1992]). Therefore, given that our review of the record reveals that counsel filed an omnibus motion, familiarized himself with the relevant evidence, effectively cross-examined the People's witnesses at the Huntley hearing and at trial, advanced a cogent trial strategy, made relevant objections and made coherent opening and closing statements, we find that defendant received meaningful representation (see People v Hogan, 26 NY3d at 787; People v Dean, 122 AD3d at 1005).
Garry, P.J., Egan Jr., Lynch and Clark, JJ., concur.
ORDERED that the judgments are affirmed.



Footnotes

Footnote 1: The written statement contains one reference to the suppressed oral statement. Prior to trial, the parties agreed that the People would redact that question and answer so as to remove any reference to the suppressed oral statement. As such, this portion of the written statement was not before the jury.